State v. Woodcock

STATE OF NORTH CAROLINA v. LEROY C. WOODCOCK

No. 724SC390

(Filed 17 January 1973)

**1. Warehousemen § 1— issuing false warehouse receipts — indictment — identity of the receipts — ambiguous language**

Indictment for issuing warehouse receipts without knowing them to be true sufficiently notified defendant of the receipts which he was charged with having issued where it identified the receipts by their numbers, and the additional ambiguous language "each said receipt for 112,000 pounds of No. 2 yellow corn and 20,000 bushels of No. 2 yellow corn" did not render the indictment subject to quashal since it was taken from the receipts themselves and served merely to identify the receipts further.

**2. Warehousemen § 1— issuing false warehouse receipt**

A violation of G.S. 106-443 occurs when one issues a warehouse receipt for any amount of grain without knowing that such grain has actually been placed in the warehouse under the control of the manager thereof.

**3. Warehousemen § 1— issuing false warehouse receipts — sufficiency of evidence**

The State's evidence was sufficient for the jury in a prosecution for issuing warehouse receipts without knowing them to be true in violation of G.S. 106-443 where it tended to show that defendant issued receipts calling for corn in excess of the amount then in the warehouse of which he was manager, that defendant at that time knew that the Federal Examiner was present checking the records and measuring the corn in the warehouse, and that shortly prior to issuing the receipts defendant had told the Examiner that he felt like they were "a little short."

**4. Warehousemen § 1— "issuance" of warehouse receipts**

Warehouse receipts were "issued" by a warehouse manager within the meaning of G.S. 106-443 when, after they had been signed by him, they were at his direction delivered to the bank where they were no longer under his control.

**5. Warehousemen § 1— issuing false warehouse receipts — lease to State Warehouse Superintendent not properly executed — admissibility**

Although a written lease of a warehouse from a corporation to the State Warehouse Superintendent was for a term which might run more than three years, did not bear the corporate seal of the lessor and was not properly attested by its secretary, the lease was competent in a prosecution under G.S. 106-443 to show that the warehouse managed by defendant was a facility operated under the provisions of the North Carolina Agricultural Warehouse Act.

APPEAL by defendant from *Copeland, Judge,* 8 November 1971 Criminal Session of Superior Court held in DUPLIN County.

Defendant, manager of Farmer's Grain Elevator in Duplin County, was tried on his plea of not guilty to an indictment which charged that on 6 May 1970 he "did unlawfully, wilfully, and feloniously issue and aid in the issuing of warehouse receipts," which were described in the indictment as bearing Nos. 974 through 986 inclusive, "each said receipt for 112,000 pounds of No. 2 yellow corn and 20,000 bushels of No. 2 yellow corn, without knowing at the time of the issuance of said warehouse receipts that the total amount of No. 2 yellow corn represented by all of said numbered receipts as stored in Farmer's Grain Elevator had actually been placed in the said Farmer's Grain Elevator and under his control," in violation of G.S. 106-443.

The State introduced evidence which, in part, tended to show the following: On 6 May 1970, and for some time prior thereto, defendant was the local manager of the Farmer's Grain Elevator in Duplin County, a facility of the North Carolina Warehouse System. On that date he held a license as such local manager, which had been issued to him on 1 September 1969 by the North Carolina Department of Agriculture pursuant to G.S. Chap. 106, Art. 38, and he was authorized to issue warehouse receipts for grain stored at said facility. He was also the Secretary-Treasurer of Southeastern Farmer's Grain Association, Inc., a position which he had held since October 1968. On the afternoon of 5 May 1970, L. L. Brown, an examiner for the U. S. Department of Agriculture, appeared at the elevator for the purpose of making an examination. Mr. Brown first examined the warehouse receipt book to see how far receipts had been issued. He then, at approximately 2:00 p.m. on 5 May 1970, examined the grain storage bins and from his measurements and computations ascertained that there was a total of 13,126 bushels of No. 2 yellow corn then stored on the premises

On the next morning, 6 May 1970, when Mr. Brown arrived at the elevator at 8:00 o'clock, defendant met him outside the office and said, "Brother Brown, I feel like we're a little short." Brown informed defendant that he would continue his examination of the records and would then call the office of the State Warehouse Superintendent.

Mrs. Connie Carlton, who worked at the grain elevator under defendant as a secretary and bookkeeper, testified that on the

morning of 6 May 1970, after defendant had gone to the bank, he came back and told her to prepare 13 warehouse receipts in denominations of 20,000 bushels of No. 2 yellow corn each. Acting on defendant's instructions, Mrs. Carlton prepared these receipts, using printed forms furnished for that purpose by the North Carolina State Warehouse System, by typing in certain of the blanks. These receipts bore numbers 974 through 986 inclusive. Each receipt was dated 6 May 1970, bore defendant's signature on the line provided for the signature of the local manager, and acknowledged receipt from Southeastern Farmer's Grain Association for storage in the Farmer's Grain Elevator of "One Hundred Twelve Thousand" pounds of No. 2 yellow corn. In the body of each receipt, Mrs. Carlton typed in the words "One Hundred Twelve Thousand" on the blank line immediately preceding the printed words "pounds of grain." On two blank spaces on the printed form, one headed, "pounds of grain: including dockage, if any" and the other headed "net pounds," she typed the figure, "112,000." On two blank spaces on the form, one headed, "gross bushels," and the other headed, "net bushels," she typed the figure, "20,000.00." Mrs. Carlton testified that she put "20,000 bushels (on the warehouse receipts) because he (the defendant) told me to make them for 20,000 bushels. . . . Mr. Woodcock did not tell me the poundage to put in. He just told me the bushels. 20,000 on each receipt." (She testified that she knew there were 56 pounds of corn in a bushel, and that she did the multiplication to obtain the poundage and later learned she had made a mistake.) Mrs. Carlton also typed two notes on forms of Branch Banking & Trust Company, dating each of them 6 May 1970, and typing one in the amount of $142,080.00, showing on the face of this note that it was secured by warehouse receipts Nos. 974-979 for 120,000 bushels, and the other note in the amount of $165,760.00, showing this to be secured by warehouse receipts Nos. 980-986 for 140,000 bushels. These notes were payable to the order of the bank and were signed in the name of Southeastern Farmer's Grain Asso., Inc., by Paul E. Dail, its President, and by defendant, as its Secretary-Treasurer. Still acting on instructions of defendant, Mrs. Carlton, on the morning of 6 May 1970, delivered the two notes and the thirteen warehouse receipts, together with a deposit slip in the amount of the total of the two notes, $307,840.00, to the bank, which credited the account of Southeastern Farmer's Grain Association, Inc., in the amount of $307,840.00. At that time Mrs. Carlton also picked up from the bank certain outstanding warehouse receipts which

the bank then held, which she brought back to the warehouse and canceled. She then, still on the morning of 6 May 1970, showed these canceled warehouse receipts to Mr. Brown, the Federal Examiner. Later, on the afternoon of 7 May 1970, Mr. Brown again examined the warehouse receipt book and learned that thirteen additional warehouse receipts had been issued since he had examined it on 5 May 1970.

The State also introduced evidence that an audit of the warehouse records revealed that no grain was received at the elevator on 5 May 1970 and that the total number of bushels of yellow corn received on 6 May 1970 was 2800.55 bushels. Other evidence will be referred to in the opinion.

The defendant did not introduce any evidence. The jury found him guilty, and from judgment imposing a prison sentence of not less than three nor more than five years, defendant appealed.

*Attorney General Robert Morgan by Assistant Attorneys General Millard R. Rich, Jr., and Dale P. Johnson for the State.*

*Corbett & Fisler by Leon H. Corbett; and White, Allen, Hooten & Hines by Thomas J. White for defendant appellant.*

PARKER, Judge.

G.S. 106-443, for violation of which defendant was found guilty, provides as follows:

"G.S. 106-443. *Issuance of false receipt a felony; punishment.*—The manager of any warehouse, or any agent, employee, or servant, who issues or aids in issuing a receipt for cotton or other agricultural commodity without knowing that such cotton or other agricultural commodity has actually been placed in the warehouse under the control of the manager thereof shall be guilty of a felony, and upon conviction be punished for each offense by imprisonment in the State penitentiary for a period of not less than one or more than five years, or by a fine not exceeding ten times the market value of the cotton or other agricultural commodity thus represented as having been stored."

Despite its caption, the gist of the offense created by the statute is not the issuing of a false warehouse receipt; rather, it is the issuing of a receipt *without knowing it to be true.* Of

course, one way in which the State may show that this had been done is to introduce evidence that the receipt was in fact false, from which it would be a logical inference for the jury to draw that the person issuing the receipt could not have known it to be true. This was, in part, the method followed in presentation of the State's evidence in the present case.

[1, 2] Defendant moved to quash the indictment, contending it to be ambiguous in that it is not clear whether he was charged with issuing thirteen receipts, each for 112,000 pounds of corn (which at 56 pounds to a bushel, the proper conversion factor as shown by the evidence, would be equivalent to 2,000 bushels) or receipts for 20,000 bushels, or receipts for both (2,000 plus 20,000 bushels). The ambiguity, however, was created not by the indictment but by the very warehouse receipts which defendant was charged with having issued and which the State's evidence shows he did in fact sign and issue. The indictment clearly identified these receipts by their numbers. The additional language, "each said receipt for 112,000 pounds of No. 2 yellow corn and 20,000 bushels of No. 2 yellow corn" served merely to identify them further. Violation of G.S. 106-443 occurs when one issues a warehouse receipt for *any* amount of grain without knowing that such grain "has actually been placed in the warehouse under the control of the manager thereof." It was not necessary for the State to allege any exact amount of grain, and the language in the indictment further identifying the receipts by reference to the poundage and bushels therein set forth may well be treated as surplusage. The indictment here clearly notified defendant of the exact receipts which he was charged with having issued in violation of the statute, and if any ambiguity existed as to their meaning, defendant himself created it. "An indictment is sufficient if it charges all essential elements of the offense with sufficient particularity to apprise the defendant of the specific accusations against him and (1) will enable him to prepare his defense and (2) will protect him against another prosecution for that same offense." *State v. Bowden,* 272 N.C. 481, 158 S.E. 2d 493. This, the indictment in the present case did. Defendant's motion to quash was properly denied.

[3] Defendant's motions for a directed verdict of not guilty were also properly denied. The State's evidence showed that on the afternoon of 5 May 1970 the Federal Examiner measured the corn at the warehouse and found 13,126 bushels, no addi-

tional corn was received that day, and only 2800.55 bushels were received during the entire following day. With a total of approximately 16,000 bushels in the warehouse at the close of business on 6 May 1970, defendant, on the morning of that day, issued thirteen warehouse receipts, each of which, if the evidence be considered in the light most favorable to the State, called for 20,000 bushels, or a total of 260,000 bushels for the entire thirteen receipts. Even if the ambiguity in words and figures typed on the receipts be resolved most favorably to defendant, the State's evidence would still show that he issued thirteen receipts, each calling for 112,000 pounds, or 2,000 bushels, making a total of 26,000 bushels, an amount still very substantially greater than was in the warehouse when the receipts were issued. Thus, whatever the correct resolution of the conflicting words and figures on the receipts might be under applicable commercial law, a task which we are not presently called upon to perform, the State's evidence showed that defendant on 6 May 1970 issued receipts calling for corn in a total amount substantially in excess of the amount which was then in the warehouse. There was also evidence that at the time he did this defendant knew that the Federal Examiner was present checking the records and measuring the corn in the warehouse, and that shortly prior to issuing the receipts described in the indictment defendant had told this Examiner that he felt like they were "a little short." From this evidence it was an entirely logical and permissible inference for the jury to draw that defendant issued the receipts without knowing that the grain called for therein had actually been placed in the warehouse under his control.

[4]  Defendant's contention that there was no evidence that he "issued" the receipts, since they were typed and were physically delivered to the bank by his secretary, is without merit. The evidence shows that defendant was the licensed manager of the warehouse, that in that capacity he signed the receipts, and that his secretary acted only according to his instructions. We hold that the receipts were "issued" by defendant within the meaning of G.S. 106-443 when, after they had been signed by him, they were at his direction delivered to the bank where they were no longer under his control. The facts that the receipts were made out to Southeastern Farmer's Grain Association, Inc., the entity which owned and operated the warehouse, and that the Association never properly endorsed the receipts to the bank, are immaterial. The evidence shows that defendant,

not the Association, was the licensed manager of the warehouse and as such was the person authorized to issue receipts for the agricultural commodities stored therein. And there was plenary evidence to show that in causing the receipts to be delivered to the bank, the defendant, both in his capacity as licensed manager of the warehouse and as an officer of the Grain Association, fully intended that the bank obtain a security interest in the receipts. We hold these circumstances sufficient to show that defendant "issued" the receipts within the meaning of G.S. 106-443. There was no error in overruling defendant's motions for a directed verdict and in submitting the case to the jury.

[5]  Defendant contends that the trial court committed prejudicial error in admitting in evidence over his objection a written lease of the warehouse from Southeastern Farmer's Grain Association, Inc., to the State Warehouse Superintendent. He contends this was error in that the lease was for a term which might run more than three years, did not bear the corporate seal of the lessor corporation, and was not properly attested by its secretary. Even so, this document was relevant in this case, if at all, only to show that the warehouse of which defendant was manager was a facility operated under the provisions of the North Carolina Agricultural Warehouse Act, G.S. Chap. 106, Art. 38, and even though the lease might not have been in all respects properly executed, it was competent in evidence for that purpose. Moreover, W. G. Parham, Jr., the State Warehouse Superintendent, testified without objection from defendant that the Farmer's Grain Elevator at Warsaw, Duplin County, of which defendant was the licensed local manager, was a facility of the North Carolina Warehouse System. In addition, the Local Manager's License issued to defendant, which was also admitted in evidence without objection from him, further tended to establish that the elevator here in question was a warehouse for the storage of grain conducted in accordance with the North Carolina Agricultural Warehouse Act. Defendant suffered no prejudicial error when the lease was admitted in evidence.

We have carefully examined all of defendant's remaining assignments of error which are directed to the trial court's actions in the course of conducting the trial and ruling on the admission of evidence, and find no error sufficiently prejudicial to warrant the granting of a new trial. We do not agree with appellant's contention that the cumulative effect of the trial

judge's rulings and actions amounted to an expression of opinion in contravention of G.S. 1-180.

We find no error in the trial court's denial of the defendant's prayer for special instructions to the jury. The charge, considered contextually and as a whole, was free from prejudicial errors and adequately declared and explained the law arising on the evidence given in the case. After carefully examining all of defendant's assignments of error, we find in his trial and in the judgment appealed from

No error.

Judges BRITT and HEDRICK concur.